CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 23, 2018
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
     DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

|  |  |
|---|---|
| **WALTER MADISON**<br>98 William Street<br>Mineral, VA 23117,<br><br>*Plaintiff*,<br><br>v.<br><br>**DOMINION ENERGY, INC.**<br>701 East Cary Street<br>Richmond, VA 23219,<br><br>**Serve Registered Agent**:<br><br>   CT Corporation System,<br>   4701 Cox Road, Suite 285<br>   Glen Allen, Virginia 23060,<br><br>*Defendant.* | Civil Action No.: 3:18-cv-00036 |

**CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY**

1. Plaintiff Walter Madison ("Madison" or "Plaintiff") brings this Complaint of whistleblower discrimination before the United States District Court for the Western District of Virginia, pursuant to the employee provisions of the Energy Reorganization Act of 1974 ("ERA"), 42 U.S.C. § 5851 *et seq.*, against Defendant Dominion Energy Inc. ("Dominion" or "Defendant").

2. Dominion unlawfully retaliated against Madison because he disclosed information about Dominion's safety violations that violated the Nuclear Regulatory Commission ("NRC") rules and regulations.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, specifically, the ERA.

4. This Court has personal jurisdiction over the Defendant because Defendant is a Virginia corporation with its corporate headquarters in Richmond, Virginia.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within Louisa County, in this judicial district.

## PARTIES

6. Plaintiff Walter Madison is a citizen of the United States residing in Mineral, Virginia, and Madison was employed by Defendant in Virginia from approximately 2001 to 2017.

7. Defendant Dominion Energy is a Virginia corporation with its corporate headquarters in Richmond, Virginia.

## FACTS

8. Dominion hired Madison in or around November 2001 to work as a Ground's Man at Dominion's facility at 7500 West Broad Street in Richmond, Virginia.

9. Dominion promoted Madison in or about 2002 to Nuclear Maintenance Electrician, and again in or about 2009 to Nuclear Maintenance Supervisor. Madison worked in both of those positions at Dominion's North Anna Power Station in Mineral, Virginia.

10. Throughout Madison's career at Dominion, Madison's supervisors consistently gave him positive feedback regarding his work performance.

11. One of Madison's job responsibilities as Nuclear Maintenance Supervisor was to "walkdown tags" under Dominion's OP-AA-200 policy, which ensures that equipment

scheduled to be worked on by craft employees was properly tagged by the Operations Department.

12. According to Dominion's OP-AA-200 policy, before a craft employee can repair equipment at the facility, there are several steps which must be taken. First, a member of Dominion's Operations Department must de-energize the equipment. After this is completed, an Operations employee places a tag on the equipment to signify that the equipment is de-energized. Next, Nuclear Maintenance Supervisors such as Madison are supposed to walk down to the site to verify that the tags are hung on the appropriate equipment. The Supervisor then signs into Dominion's database ("ESOMs") to electronically record that the tag is hung appropriately. Finally, the craft employee that is working on the equipment verifies the tag is hung and performs a "live-dead-live" check to verify that the equipment is de-energized. The NRC has a similar requirement for nuclear power plants pursuant to 10 C.F.R. § 50 Appendix B, which sets forth the NRC's quality assurance criteria for nuclear power plants.

13. 10 C.F.R. § 50 mandates that nuclear power plants establish measures to indicate, by the use of markings such as stamps, tags, labels, routing cards, or other suitable means, the status of inspections and tests performed upon individual pieces of equipment in a nuclear power plant. These measures provide for the identification of items which have satisfactorily passed required inspections and tests, where necessary to preclude inadvertent bypassing of such inspections and tests.

14. At Dominion's North Anna and Surry facility, however, it was not common practice for Dominion Supervisors to physically go to the site themselves and verify that a tag was placed on the equipment. Instead, many Supervisors, including Madison, would frequently delegate this responsibility to other qualified craft personnel.

15. Throughout Madison's employment with Dominion, senior personnel such as Ed Trainum, Gary Madison, Chris Chaney, and many others set the example that it was an acceptable practice for Supervisors to delegate the task of making sure that a tag was placed on the equipment to qualified personnel.

16. Madison was one of many employees who engaged in this practice, and no Dominion employee or supervisor or auditor or manager ever complained about Madison delegating this task to others until 2016.

17. In 2016, Madison began working under a new supervisor, Brent Meadows, Dominion's Superintendent of Nuclear Maintenance.

18. Two weeks into Meadows' assignment at North Anna, Meadows began investigating Madison after claiming to notice an alleged change in Madison's personality and purported occasional tardiness. Thereafter, Meadows reported Madison to Dominion's "Fitness for Duty" office and scheduled a Fitness for Duty exam on Madison's only day off for that week. Meadows investigated Madison's recorded work time and Madison's "walkdowns" or "tag outs" (i.e. the aforementioned tagging procedure).

19. On or about November 15, 2016, Meadows scheduled a fact-finding interview with Madison and two other managers, Jim Jenkins and Eric Vestre, to discuss Madison's tag outs. Meadows, Jenkins, and Vestre questioned Madison about arriving late to work, Madison's time spent outside of the protected area at the North Anna facility, and how Madison conducts tag outs.

20. Madison was confused because this was the first time Madison had heard any formal allegations of his being late, or absent, or not being where he was supposed to be, or not following procedure. Madison acknowledged he did not follow procedure with precision when

he allowed other qualified personnel to walk down his tags (although Madison explained and maintained that his doing so was consistent with Madison's training and was common practice at Dominion) and Madison took responsibility for his actions.

21. Madison was advised after the meeting to draft a performance improvement plan to address the issues revealed in the fact-finding interview, and he completed his performance improvement plan the next day on or about November 16, 2016.

22. On or about November 20, 2016, Vestre called Madison and told him to report to in-processing and not to come inside the plant.

23. On or about November 21, 2016, Madison reported to the in-processing area and learned that his clearance was being placed on hold and that he was required to have a phone interview with Johnny Rodgers, Dominion's Supervisor of Security Services.

24. During the fact-finding interview with Rodgers, Rodgers asked about Madison's tag out records. In response, Madison reported that tag out procedures were routinely not followed by supervisors at Dominion. Specifically, Madison reported that it was common practice for Dominion supervisors to not walk down tags at the North Anna facility. Madison also reported that he was trained by previous supervisors that it was acceptable to allow craft employees to walk down tags on supervisors' behalf.

25. Madison noted that he never received any corrective actions or coaching for engaging in this practice, and that when he was an electrician his supervisor instructed him to walk down his supervisor's tags.

26. After the meeting with Rodgers, Jenkins called Madison and Jenkins told Madison that Madison would have to go without pay or use vacation time until the investigation was complete.

27. On or about November 23, 2016, Kara Atkins, a senior human resources partner, called Madison and asked if Madison could meet with her to discuss "the whole situation." When Madison arrived at the designated meeting area on or about November 28, 2016, Atkins walked him to meet with Wendy Bailey, a senior investigator, for a third-fact finding interview.

28. During this interview, Madison again reported that tag out procedures were routinely not followed by supervisors and that it was common practice for Dominion supervisors to not walk down tags personally at the North Anna facility. Madison also reported again that he was trained by previous supervisors that it was acceptable to allow craft employees to walk down tags on supervisors' behalf and that this was a common practice at Dominion's North Anna facility and that unwritten protocols have become the standard practice due to the previous management's expectations and lack of enforcement.

29. Madison also reported to Bailey that many of Madison's supervisors rarely walked down a tag before sending an electrician to complete the work. Madison also reported that during Ed Trainum's tenure management did not enforce the tag out policy and that Trainum was pleased as long as the work was completed and the electricians' and supervisors' actions did not result in Trainum getting in any trouble.

30. At the end of the interview, Bailey informed Madison that she would interview co-workers and would by the end of the week write a report that would be provided to Dominion's ethics and compliance attorney.

31. On or about November 29, 2016, Bailey interviewed Chris Holloway, Supervisor Nuclear Maintenance. In Holloway's interview Holloway admitted that he did not always walk down tags and that he also delegated the task to others.

32. On or about November 30, 2016, Bailey interviewed an unnamed electrician who

6

revealed that two other supervisors, other than Madison, delegated to the unnamed electrician the task of walking down tags. Thereafter Bailey failed and/or refused to interview any other electricians or craft employees to substantiate Madison's and the unnamed electrician's claims about widespread violations of Dominion's tag out procedures.

33. Madison received an e-mail from Jenkins on or about December 12, 2016, after being out of work for almost a month. Jenkins informed Madison in the email that they would have a meeting on or about December 15, 2016, to discuss the result of the investigation.

34. On December 15, 2016, Madison's counsel contacted counsel for Dominion, and inquired about the investigation into Madison.

35. In a meeting later that same day, Dominion terminated Madison. The meeting lasted no longer than a couple of minutes, and Jenkins never discussed the investigation results with Madison. Instead Jenkins terminated Madison and advised Madison that his termination purportedly was due to trustworthiness over the tagging procedure and an alleged misuse of time spent by Madison in the gym that is provided by Dominion for the use of its employees. When Madison asked for clarification on how an exempt employee could be terminated for using the gym during work hours, Jenkins advised that Madison was terminated based on a combination of the two issues.

36. Madison was terminated under the pretext that he was violating Dominion's OP-AA-200 policy. However, it was common practice for Supervisors to not follow this procedure, and yet Madison was the only employee terminated because he was the one employee willing to be honest about the practice of others not following this procedure.

37. Remarkably, Dominion employees who engaged in conduct that posed a far more serious threat to safety, were treated more favorably than Madison. In fact, Brent Meadows—

the very person who reported Madison for a failure to follow procedure—instructed electrician Johann Miller to operate equipment which was "red tagged" in or around April 2017. Red tags are placed on equipment which are dangerous and should not be touched under any circumstances. Legal proceedings were initiated against Meadows through an OSHA complaint for his dangerous actions, but Dominion did not terminate Meadows. Instead, Dominion reassigned Meadows to a new position.

38. Dominion's decision to terminate an employee for telling the truth, while merely reprimanding those who commit egregious safety violations, is consistent with the widespread culture of retaliation that exists at Dominion. For example, employees are aware of rampant sexual harassment at the North Anna plant, but employees do not report it. Forrest Mills, a Supervisor of Nuclear Maintenance, is known by many employees as "feel 'em up Forrest," because of his repeated sexual assaults of female employees. However, employees who might ordinarily report Forrest's harassment do not feel comfortable doing so out of fear that they will be retaliated against for telling the truth.

39. On or about January 9, 2017, Madison received a notice of appeal rights from Dominion, and on or about March 1, 2017, Madison appealed his termination to Dominion's Appeals Committee.

40. On or about April 19, 2017, the Appeals Committee upheld the denial of his access authorization to Dominion's nuclear facility.

41. On or about May 19, 2017, Madison filed a complaint with the Department of Labor's Occupational Safety and Health Administration.

42. Pursuant to the Energy Reorganization Act of 1974 ("ERA"), 42 U.S.C. § 5851, Madison files this Complaint in federal district court now that 365 days have elapsed after the

8

Case 3:18-cv-00036-NKM-JCH   Document 1   Filed 05/23/18   Page 8 of 11   Pageid#: 8

filing of his initial complaint.

## COUNT I
### Energy Reauthorization Act Whistleblower Retaliation
### 42 U.S.C. § 5851

43. Madison hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

44. Dominion is an employer as defined by 42 U.S.C. § 5851(2).

45. Madison was an employee of Dominion.

46. The ERA prohibits an employer from discharging or discriminating against an employee because the employee engaged in conduct that is protected under the ERA.

47. Under the ERA protected conduct includes providing information to a person with supervisory authority about a reasonably perceived safety concern, including concerns related to the rules and regulations of the NRC.

48. Under the ERA, protected conduct includes employee assistance, participation, or intended participation in any manner in an investigation or proceeding to carry out the purposes of the ERA. 42 U.S.C. § 5851(a)(1)(F).

49. Madison engaged in protected conduct when he assisted in the investigation of whether supervisors' failure to verify tag outs as required by both Dominion's OP-AA-200 procedure and 10 C.F.R. § 50, Appendix B was widespread or isolated.

50. Dominion terminated Madison because he provided truthful testimony about Dominion's widespread violation of NRC's quality assurance rules and regulations at North Anna.

51. Madison's protected activity was a contributing factor to Dominion's decision to terminate Madison and in Dominion's decision to revoke Madison's access authorization.

52. Dominion terminated Madison in retaliation for his protected activity.

53. Dominion revoked Madison's access authorization in retaliation for his protected activity.

54. Dominion has no legitimate business reason for its decision to terminate Madison, and Dominion's stated reasons for terminating Madison are pretextual.

55. Dominion has no legitimate business reason for its decision to revoke Madison's access authorization, and Dominion's stated reasons for doing so are pretextual.

56. As a direct and proximate result of Dominion's unlawful retaliatory employment practices, Madison has sustained and will in the future sustain permanent and irreparable economic loss and other harm, including but not limited to loss of employment, damage to his professional reputation, lost earnings, and emotional distress.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests he be awarded the following relief against Defendant as follows:

1. Declare that Defendant's conduct violated Section 211 of the ERA, 42 U.S.C. § 5851; and/or,

2. Award Plaintiff any and all equitable relief necessary to reinstate Plaintiff's employment status and privileges at the time Defendants' conduct violated Section 211 of the ERA, 42 U.S.C. § 5851 including:

    a. An injunction reinstating Plaintiff to the previous position and level of authority with all the terms, conditions, and privileges he previously enjoyed;

    b. The removal of the individuals directly involved with creating a chilled work environment; and

  c. An affirmative injunction protecting Plaintiff for the balance of his career with Defendant; and/or

3. Award Plaintiff compensatory damages for any and all, lost scheduled raises and/or bonuses, and lost wages resulting from his termination; and/or

4. Award such other relief as may be just and proper, including reasonable attorney fees and costs.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

              Respectfully submitted,

              _____/s/_____
              R. Scott Oswald
              Adam Augustine Carter, VSB # 32722
              The Employment Law Group, P.C.
              888 17th Street, NW, 9th Floor
              Washington, D.C. 20006
              (202) 261-2803
              (202) 261-2835 (facsimile)
              soswald@employmentlawgroup.com
              acarter@employmentlawgroup.com
              *Counsel for Plaintiff Walter Madison*