CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
6/1/2020
JULIA C. DUDLEY, CLERK
BY:  s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| WALTER MADISON, | CASE NO. 3:18-cv-00036 |
| *Plaintiff*, |  |
| v. | MEMORANDUM OPINION |
| DOMINION ENERGY, INC., |  |
| *Defendant*. | JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant Dominion Energy's Motion for Summary Judgment. Dkt. 32. Upon consideration of that motion and the parties' briefs, accompanying exhibits, and oral argument, the Court will grant the motion and award summary judgment to Dominion.

## Background

1. Statutory Scheme

This case involves whistleblower protections of the Energy Reorganization Act of 1974 ("ERA").[1] These provisions serve to "protect[] energy workers who report or otherwise act upon safety concerns."[2]

The ERA states that "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment," because the employee had notified his employer of an alleged violation of the ERA

---

[1] 42 U.S.C. § 5851, *amended by* Pub. L. No. 102-486, 106 Stat. 2776 (1992).

[2] *Sanders v. Energy Nw.*, 812 F.3d 1193, 1196 (9th Cir. 2016).

or the Atomic Energy Act,[3] "refused to engage in any practice made unlawful" by either statute, or engaged in other protected conduct.[4] The ERA was "patterned after other whistleblower statutes affecting other industries," and it was "designed to protect workers who report safety concerns and to encourage nuclear safety generally."[5] Courts have interpreted the statute in light of its "broad, remedial purpose."[6]

The ERA allows an aggrieved employee to file a complaint with the Secretary of Labor within 180 days of the violation.[7] If the Secretary has not issued a final ruling within one year after the complaint was filed, the employee "may bring an action at law or equity for de novo review in the appropriate district court of the United States."[8] The district court "shall have jurisdiction over such an action without regard to the amount in controversy."[9, 10]

2. Factual Background

a. *Madison's Position and Responsibilities*

In 2002, Plaintiff Walter Madison began working at Dominion's North Anna Power Station (a nuclear energy power station) as an electrician. His work focused on maintaining electrical

---

[3] The Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*

[4] 42 U.S.C. § 5851(a)(1)(A), (B), (C)–(F).

[5] *Am. Nuclear Res. v. U.S. Dep't of Labor*, 134 F.3d 1292, 1295 (6th Cir. 1998).

[6] *Am. Nuclear Res.*, 134 F.3d at 1295 (quoting *Mackowiak v. Univ. Nuclear Sys., Inc.*, 735 F.2d 1159, 1163 (9th Cir. 1984)).

[7] 42 U.S.C. § 5851(b)(1).

[8] *Id*. § 5851(b)(4).

[9] *Id*. § 5851(b)(4).

[10] Review may be appropriate in different fora depending on the posture of the case. If the case proceeds before the Department of Labor until the Secretary issues an order, however, that order is subject to review in the applicable U.S. Court of Appeals. *Id*. § 5851(c). If any person has failed to comply with an order of the Secretary, the Secretary may file a civil action in district court. *Id*. § 5851(d). Here, Madison removed his complaint from the Department of Labor, and the parties do not dispute his case was properly brought in this Court.

components at North Anna. In 2009, Dominion promoted Madison to be an Electrical Maintenance Supervisor.[11]

Typically, Madison's workstation was located inside the "protected area" of North Anna, *i.e.*, those areas subject to heightened security and accessible only by cleared personnel with ID badges.[12] Once or twice a year, North Anna undergoes outages due to refueling; during those periods, Madison's workstation would be outside the protected area, but his work still required him to regularly go into the protected area.[13]

      b. *Walk-Down Safety Checks*

Dominion requires personnel performing maintenance work at North Anna Power Station to take certain steps to ensure equipment is de-energized and non-operational before work can begin on the equipment.[14] Dominion implemented Administrative Procedure OP-AA-200 (entitled "Equipment Clearance"), which includes procedures to ensure that energy sources are isolated for worker protection.[15] Among other things, this policy describes "tagging" procedure, whereby the "Tagout Holder" will "walk down" and verify that energy sources have been isolated, a tag has been properly hung on the equipment, and that the work-boundary is safe (hereinafter, a "walk-down safety check").[16]

Section 3.2.7 of OP-AA-200 is entitled "Tagout Holder/Lead Craft Acceptance of Tagout," and states, in pertinent part:

---

[11] Dkt. 33-3 ("Madison Dep.") at 62:18-24, 64:7-14, 65:23-66:1, 81:6-12.

[12] *Id*. 155:3-8, 156:2-8.

[13] *Id*. 157:9-158:6.

[14] Dkt. 33-12 ("Jenkins Decl.") ¶¶ 3, 4.

[15] Dominion implemented OP-AA-200 to comply with Nuclear Regulatory Commission ("NRC") regulations. Jenkins Decl. ¶ 3.

[16] *See* Jenkins Decl. ¶ 4; Madison Dep. 80:1-15, 115:1-15.

    a. **ENSURE** that the tagging boundary is adequate for the work being performed.

    b. **ENSURE** Danger Tags are hung on the designated equipment.

- At least the first individual of each Craft who will hold the clearance walks down the Tagout.

- The walkdown should be sufficient to ensure an adequate safe boundary for work. It may not be necessary to walkdown the entire Tagout depending on scope of work.

- In all cases, the clearance holder should understand the basis for safety of the personnel under their leadership.

    c. **BRIEF** work order holders on tagging boundaries and field activities.

    d. **SIGN** on the Tagout as Tagout holder in eSOMS.[17]

    e. **ENSURE** a Live-Dead-Live check has been performed in accordance with SA-AA-125, Electrical Safety, before starting ANY work if necessary for safety. **COMPLETE** the check before beginning physical work activities.

    f. **IF** performing work that requires tagging, **THEN SIGN** on as work order holder in eSOMS.[18]

(Emphasis in original). As part of a walk-down safety check, the Tagout Holder signs onto Dominion's tagging database "eSOMS," and must confirm: "(1) I have verified the tagging boundary and find it acceptable for the scope of work. (2) I have walked down the area and consider it safe to work. (3) My team will be briefed before starting work."[19]

    Dominion offered evidence that the Tagout Holder must be "someone at the supervisor level or above."[20] By contrast, Madison testified that a Tagout Holder could be either a supervisor

---

[17] eSOMS is Dominion's tagging database. Meadows Decl. ¶ 12.

[18] OP-AA-200 § 3.2.7, Dkt. 33-3 at 85 (excerpt).

[19] Jenkins Decl. ¶ 5; eSOMS Database Sign-in Screen, Dkt. 33-13 at 2.

[20] *E.g.*, Jenkins Decl. ¶¶ 4, 5.

or his designee.[21] The Court will address this issue later. In any event, a walk-down safety check must be completed before electricians or other craft employees are even authorized to begin work on equipment.[22] Dominion's Director of Nuclear Safety and Licensing James Jenkins has attested that "[t]his process is critically important because, if workers commence work on equipment that is not properly de-energized, they could be seriously injured, or worse."[23]

Supervisors at Dominion receive regular and at least annual training on the tagging process that OP-AA-200 requires.[24]

### c. *Superintendent Begins Investigating Madison, Whose Absences Prompt Surprise and Alarm*

In early October 2016, Dominion hired a new Superintendent of Electrical Maintenance at North Anna, Brent Meadows, who supervised six or seven Electrical Maintenance Supervisors, including Madison. As part of his transition into his new role, Meadows evaluated each of his supervisors' performance.[25]

 Meadows observed Madison "coming in late to his shift during [Meadows'] first or second week," and others in the Electrical Maintenance team "mentioned similar concerns about Madison, including that he was spending a 'good portion' of his time at the gym, rather than supervising his crew."[26] When Meadows asked Madison about this, "he essentially brushed it aside."[27]

---

[21] Madison Dep. 113:20-22, 115:4-15.

[22] Jenkins Decl. ¶ 4;

[23] Jenkins Decl. ¶ 4; *see also* Meadows Decl. (Dkt. 33-6) ¶ 12 ("Tagging mistakes and failures can lead to serious injury or worse."); Madison Dep. 135:9-16 (agreeing that "the primary purpose of tagging is to ensure personnel safety while working on plant equipment").

[24] Jenkins Decl. ¶ 6; *see also* Madison Dep. 118-20 (describing Tagout Holder retraining).

[25] Meadows Decl. ¶ 3; *see also* Jenkins Decl. ¶ 9.

[26] Meadows Decl. ¶ 4.

[27] Meadows Decl. ¶ 4.

On October 15, 2016, Meadows requested Madison's time records—at first those from the recent refueling outage at North Anna, September 11 to October 15, 2016—so that he could "review [Madison's] work practices and determine whether the concerns [he] was hearing were legitimate."[28] Meadows compared Madison's time records to his security badge activity going into the protected area at North Anna.[29] Because Madison's crew would mostly be working in the protected area during this period, Meadows believed that the badge activity "would give [him] a rough estimate" of how much time Madison actually worked.[30]

Meadows was "surprised and alarmed" to see ten days during the outage when Madison never entered the protected area at all.[31] On eight other days, Madison was in the protected area less than an hour.[32] Indeed, on a six-day stretch, Madison did not go into the protected area at all except for one day, when he logged six minutes.[33] This "concerned [Meadows] greatly."[34] Meadows expected Madison to perform walk-down safety checks, which would have required him to go into the protected area.[35] In addition, Meadows "questioned" how Madison "was possibly supervising his crew if he was not spending any time on his shifts (or almost no time) inside the protected area."[36]

---

[28] Meadows Decl. ¶ 5.

[29] Meadows Decl. ¶¶ 5 ,6.

[30] Meadows Decl. ¶ 6.

[31] September 15, 16, 17, 24, 26, 28, 29, 30, and October 1, 3, 7 and 8, 2016. *See* Meadows Decl. ¶¶ 7, 8; Dkt. 33-7 (calendar).

[32] September 20, 22, 23, 27, October 4, 5, and 10, 2016. *See* Meadows Decl. ¶¶ 7, 8; Dkt. 33-7.

[33] September 26 to October 1, 2016. Dkt. 33-7.

[34] Meadows Decl. ¶ 7.

[35] Meadows Decl. ¶ 7.

[36] Meadows Decl. ¶ 7.

On November 1, 2016, Meadows asked to meet with his boss, then-Manager of Nuclear Maintenance James Jenkins, to discuss concerns he had identified with Madison's performance.[37] At the meeting, Meadows presented his initial findings about Madison, including that he had not entered the protected area for numerous consecutive days and that he did not enter the Radiological Control Area once during the outage. In addition, Meadows conveyed his concerns that Madison was "often away from the worksite and coming in late."[38]

Jenkins informed Meadows that several months earlier, he too had heard complaints about Madison's "presence at work and availability to his crew," including that Madison was "arriving late to his shifts and was not often in the field throughout the plant supervising his crew."[39] Jenkins had begun to look into the issue but did not complete the inquiry.[40] He directed Meadows to investigate further.[41]

    d.  *Superintendent Follow-Up Investigation of Madison*

Meadows proceeded with a more thorough investigation of Madison's timekeeping and work practices, including reviewing Madison's records from Dominion's tagging database.[42] These records showed that Madison signed onto Dominion's tagging database "as the initial Tagout Holder for more than thirty separate tags."[43] Meadows compared the dates and times Madison signed onto the tagging database as the Tagout Holder, and compared that information to

---

[37] Jenkins Decl. ¶ 10; Meadows Decl. ¶9.

[38] Jenkins Decl. ¶ 10; Meadows Decl. ¶¶ 7–11.

[39] Jenkins Decl. ¶¶ 8, 10; Meadows Decl. ¶ 9.

[40] Jenkins Decl. ¶¶ 8, 10; Meadows Decl. ¶ 9.

[41] Jenkins Decl. ¶ 10; Meadows Decl. ¶ 11.

[42] Meadows Decl. ¶ 12.

[43] Meadows Decl. ¶ 12.

his badge records.[44] Since Madison's workstation was located outside the protected area during outages, Meadows expected that Madison would have had to use his badge to enter and exit the protected area if he conducted the walk-down safety check.[45]

Meadows identified eight times[46] that Madison signed onto Dominion's tagging database system as the initial Tagout Holder—thereby confirming "(1) I have verified the tagging boundary and find it acceptable for the scope of work. (2) I have walked down the area and consider it safe to work. (3) My team will be briefed before starting work"[47]—in which "it would have been impossible for him to have done so because he was not inside the protected area during the relevant window of time."[48] For example, based upon these records, Meadows attests that in one incident on September 16, 2016, "Operations" hung and verified a tag at 9:38 p.m., Madison signed on as the Tagout Holder thirty minutes later, then at 1:04 a.m. on September 17, 2016, two electricians signed on as "Work Order Holders."[49] Madison, however, had not even entered the protected area until three days later, September 19 (and he had not been in there previously since September 14). Therefore, his badge records showed Madison did not personally conduct that walk-down safety check.[50] Based on his review of the supporting tagging database and badge records, Meadows could be "relatively certain" at that time Madison had not personally done the walk-down safety

---

[44] Meadows Decl. ¶ 13.

[45] Meadows Decl. ¶ 13.

[46] Meadows explained that there were nine separate tagout clearances, but two involved "different pieces of the same component and so could be construed as one event." Meadows Decl. ¶ 14.

[47] Jenkins Decl. ¶ 5; eSOMS Database Sign-in Screen, Dkt. 33-13 at 2.

[48] *See* Meadows Decl. ¶ 14; *see also* Dkt. 33-8 (Meadows' summary of "problematic tagout clearances").

[49] Meadows Decl. ¶ 17; *see also* Dkt. 33-8 at 2.

[50] Meadows Decl. ¶ 17; *see also* Dkt. 33-8 at 2.

check.[51] Meadows also confirmed that not one time during the fall 2016 refueling outage did Madison check out a dosimeter, which is used to monitor radiation exposure levels, and is required anywhere there is radiation.[52]

In conducting his review of Madison's tagging practices, Meadows reviewed the tagging and badge records for each of his other supervisors during the fall 2016 outage, comparing their information from Dominion's tagging database to the other supervisors' badge records.[53] Meadows did not identify any supervisors other than Madison who was identifying himself on the tagging database as having personally conducted walk-down safety checks and whose badge records disproved the assertion.[54]

On November 14, 2016, Meadows and Jenkins met to discuss the results of Meadows' continued investigation. Meadows shared his finding that Madison stated in the tagging database that he had personally conducted the walk-down safety checks eight or nine times despite badge records demonstrating that he do so. They scheduled a meeting with Madison the following day, coordinating with Dominion's Human Resources Department.[55]

        e.   *Fact-Finding Meeting on November 15, 2016*

At the November 15, 2016 meeting, Madison and Meadows and Jenkins were present, as well as Assistant Maintenance Manager Eric Vestre, who took notes.[56] Madison was asked about his tagging practices, and he responded that he conducts the walk-down safety checks, either

---

[51] Meadows Decl. ¶¶ 12–18; *see also* Dkt. 33-8.

[52] Meadows Decl. ¶ 19; *see also* Dkt. 33-9 at 2; Madison Dep. 160:12-18.

[53] Meadows Decl. ¶ 23.

[54] Meadows Decl. ¶ 23.

[55] Jenkins Decl. ¶¶ 11–13; Meadows Decl. ¶¶ 24–25.

[56] Jenkins Decl. ¶ 13.

himself or with others—and he stated that he did that every time.[57] When Jenkins confronted Madison with his records, "he changed his story and admitted that he did not always walk-down his tags and that he directed electricians to complete his walk-downs, at least some of the time."[58] Meadows also asked Madison about numerous examples when, during non-outage times he recorded ten hours of work, but was only inside the protected area for seven hours or less. In response, Madison said that he went to the gym at least one hour each morning, and admitted he was inaccurately recording his time. "To make up for it, Madison offered to come in thirty minutes early for the rest of his career.'"[59]

### f. *Briefing of Site Vice President; Further Investigation Ordered*

On November 17, 2016, Jenkins briefed Site Vice President Gerald Bischof concerning Meadows's analysis of Madison's records, including Madison's inaccurate reporting of his time, the asserted violation of Dominion's safety procedure; and the results of the fact-finding meeting with Madison on November 15.[60] Bischof has attested that, at the time of that meeting, he "had no

---

[57] Jenkins Decl. ¶ 14 ("Among other topics, we asked Mr. Meadows about his tagging practices under Dominion Procedure OP-AA-200. Mr. Madison responded that, as the supervisor, he always walked down his tags personally before signing on as the Tagout Holder."); Meadows Decl. ¶ 26 ("Among other topics, I asked Mr. Madison about his tagging practices. Mr. Madison initially responded that he always walked down his tags."); Dkt. 33-14 at 4 (Vestre notes, recounting, among other things, Madison states "sometimes they sign on and w/d [walk-down] together, sometimes he walks down first & then workers sign on").

[58] Jenkins Decl. ¶ 15; *see also* Meadows Decl. ¶¶ 27–28 ("Faced with that information, Madison then admitted that he did not always walk-down his own tags, and sometimes delegated that task to non-supervisor electricians instead."); Dkt. 33-14 at 4-5 ("after discussion, [Madison] admitted he was wrong").

[59] Meadows Decl. ¶¶ 29–30; Jenkins Decl. ¶ 19; *see also* Jenkins Decl. ¶17 ("Mr. Meadows asked Mr. Madison what he was doing each morning from about 9:30 to 11:00, and Mr. Madison responded that he was at the gym."); Dkt. 33-14 at 5 (Madison "admitted he was in gym from '9:30 to 10:30 or 11:00,'" and "admitted he shouldn't be going to gym so much"); *id.* at 6 (Madison "admitted that he did not record time accurately"); *id.* (Madison "offered to come in 30 minutes for the rest of his career to make up for it").

[60] Dkt. 33-23 ("Gerald Bischof Decl.") ¶¶ 3–5; Jenkins Decl. ¶ 20.

idea … that Mr. Madison was alleging that other supervisors were violating Dominion policy in the same deliberate way that he had done (and admitted)."[61] Later that evening, Bischof emailed the North Anna Plant Manager, "expressing Bischof's belief that Mr. Madison 'deserve[d] termination due to falsifying walkdown of tagouts.'"[62] Nonetheless, Bischof determined that "Dominion should pursue additional investigatory steps before terminating Mr. Madison's employment."[63] Accordingly, he referred the matter to Dominion's Site Access/Fitness for Duty officials and its Corporate Security Department.[64]

g.   *Corporate Security Investigation*

Senior Investigator Wendy Bailey in the Corporate Security Department opened an investigation into whether Madison had violated Dominion's tagging-safety procedures and whether he had been falsely recording his working time.[65]

On November 23, 2016, Bailey received various documents, including Madison's time records, badge records, entries in Dominion's tagging database, notes from the November 15, 2016 fact-finding meeting, as well as a summary of Madison's interview with the then-Supervisor of Security Services on November 21, 2016.[66] In that interview, Madison admitted "to falsifying tag out documents and improper use of time," but while he admitted "he was wrong," he also claimed

---

[61] Bischof Decl. ¶ 6.

[62] Bischof Decl. ¶ 7; *see also* Dkt. 33-24 ("What the heck is going on in Maintenance Leadership? I got a brief today on DD Madison. He deserves termination due to falsifying walkdown of tagouts. The falsification of time is more appalling than Travis.").

[63] Bischof Decl. ¶ 8.

[64] Bischof Decl. ¶ 9; *see also* Meadows Decl. ¶ 31; Jenkins Decl. ¶ 21.

[65] Dkt. 33-15 ("Bailey Decl.") ¶ 4. The matter was referred to the Corporate Security Department to investigate allegations of "timesheet misuse and fraudulent documentation." Dkt. 33-16 at 2.

[66] Bailey Decl. ¶ 5.

"the issues are commonly acceptable practice without management clear guidance [sic] on either issue."[67] At this interview, Madison also admitted his practice of working out at the gym "during duty hours" is "wrong," but also said that it was 'common practice."[68]

Bailey first interviewed Meadows, who explained the issues he had identified in Madison's work practices, and walked Bailey through the summary comparing Madison's entries the tagging database with his badge records.[69] On November 28, 2016, Bailey interviewed Madison, who at the outset of the interview explained to Madison that a summary of the discussion would be prepared, upon which he would have the ability to review for accuracy, and that he should be "truthful and forthright" during the interview.[70] Madison conceded that Dominion's policy is for the supervisor to verify the tag first on a walk-down safety check, but that it was "a legacy issue," as he had "supervisors in the past that have asked me to [conduct] the walkdown, and there are currently other supervisors that do it."[71] Madison suggested one other supervisor was delegating walk-down safety checks to subordinates as well.[72]

Bailey also asked Madison about how much time and how often he was going to the gym. During non-outage times, Madison went "every day"—he "would go at approximately 0930 and

---

[67] Dkt. 33-16 at 3 (notes from meeting).

[68] Dkt. 33-16 at 2.

[69] Bailey Decl. ¶ 6.

[70] Bailey Decl. ¶ 7; *see also* Dkt. 33-17 at 2.

[71] Dkt. 33-17 at 3; *see also id.* ("The document says the supervisor is first."); *id.* ("Q. Why must this be done by a supervisor? A. It is just the way the document is written …"); *id.* at 4 ("Q. Are these individuals qualified to complete this procedure? A. Yes. The guys I gave the task to have been both temporary supervisors … Q. Is this practice in compliance with procedures? A. Not to 100%. No it's not in compliance.").

[72] Bailey Decl. ¶ 11; Dkt. 33-17 at 4.

stay until 1100 or a little after," but he "always had [his] phone."[73] During outages, he went to the gym "maybe three times a week."[74] Madison acknowledged he did not make up this time at the end of his shifts.[75]

After Bailey's interview with Madison, she interviewed three other supervisors.[76] They confirmed they were unaware of instances of supervisors not personally conducting walk-down safety checks.[77] Bailey also interviewed an electrician whom Madison supervised—he confirmed Madison delegated walk-down safety checks to him about 25 percent of the time.[78]

On December 7, 2016, Bailey concluded her investigation and on December 16, 2016, she finalized the investigation report.[79] First, she concluded that "[t]he allegation that [Madison] falsified documents regarding procedure pertaining to tag out mandates is substantiated. Madison admitted that he has assigned non-supervisor members of his team to complete the responsibility

---

[73] Dkt. 33-17 at 5.

[74] Dkt. 33-17 at 5.

[75] Dkt. 33-17 at 6; *see also* Bailey Decl. ¶ 13.

[76] Bailey Decl. ¶ 14.

[77] Bailey Decl. ¶¶ 15–16; *see also* Dkt. 33-18 (Armstrong interview) at 3-4 ("What issues are you aware of regarding supervisors not conducting walk downs for lock out/tag outs? A. None that I'm aware of. Q. So no rumor mill of it being done by non-supervisory personnel? A. Not that I have heard, nor do I believe that it is happening."); Dkt. 33-19 (Bray interview) at 3 ("Q. Is it an acceptable practice to delegate this responsibility to nonsupervisory employees? A. I don't know of that. … Q. Have you delegate[d] this responsibility? A. No."). The third equivocated more but did not recall any specific instances in which he had done it or others had. Dkt. 33-20 (Holloway interview) at 3-4 ("Q. Does this responsibility ever get delegated? A. I would say that it has gotten delegated. I may have done it myself. It is not common practice but to say that I have never done it, I think about all of the tag outs that I have done and I can't say 100% that I haven't delegated that task. … Q. How often have you delegate[d] this responsibility? A. Very rare. I can't even put my finger on when I did, but I can't say that I haven't either.").

[78] Dkt. 33-21 (Dixon interview) at 3. He also confirmed that for other supervisors, in some instances they would "all walk them down." *Id.* at 4.

[79] Bailey Decl. ¶¶ 18–19.

which is outlined in OP-AA-200 as belonging to the tag out holder … Madison falsified these records by signing on as the tag out holder and instructing team members to conduct the walk down and tag out."[80] Second, Bailey concluded that "[t]he allegation that Madison falsified his time reports is also substantiated. Madison admitted that he was using company time of approximately one and a half hours per day to utilize the gym at the facility." Bailey found that "Madison admitted that he recorded ten and a half hours of time worked daily, ten hours of straight time and a half hour of overtime, no matter what time he arrived or how long he spent away from his work responsibilities."[81]

### h. *Madison Is Fired*

Following the conclusion of Corporate Security's investigation, Site Vice President at North Anna Gerald Bischof attested that he decided Madison's employment should be terminated.[82] He further attested that he believed "either of these violations[,] either the falsification of tagging records or the falsification of time records[,] standing alone would have warranted terminating Mr. Madison, and I would have terminated him even if his behavior had been 'limited' to just one of the two offenses."[83] Bischof believed that these offenses reflected a "lack of trustworthiness and integrity," which would have been "core failings for any Dominion employee," but were "particularly true for Mr. Madison given his role as a supervisor."[84] Jenkins

---

[80] Bailey Decl. ¶ 21; Dkt. 33-22 at 9.

[81] Bailey Decl. ¶ 21; Dkt. 33-22 at 9.

[82] Bischof ¶ 16.

[83] Bischof ¶ 15.

[84] Bischof ¶ 15.

delivered the communication to Madison that his employment was terminated on December 15, 2016.[85]

### 3.  Nuclear Regulatory Commission Proceedings

On June 30, 2017, the Nuclear Regulatory Commission ("NRC") informed Madison that it would review two "concerns" raised by him. The first concern raised was that "Dominion retaliated against [him] because [he] disclosed information about Dominion's safety violations related to tag out procedures." The second concern was that "Maintenance supervisors at North Anna are not walking down tag outs to ensure safety prior to commencing work, as required by Dominion procedure OP-AA-200."[86]

On August 30, 2017, the NRC informed Madison that it was "not initiating an investigation into [his] assertion of discrimination" described in his first concern.[87] Among other things, the NRC determined that "[e]ven if you had intended to raise a safety concern, there is no indication that your explanation that others were also failing to check tag outs (and apparently falsifying tag out documents) formed part of the basis for your termination," and instead, "[i]t appears that your management allegedly took action against you for your admission to improperly completing tag out documents and misuse of time."[88]

On May 21, 2019, the NRC informed Madison that it had concluded its investigation into "whether electrical maintenance supervisors at North Anna Power Station deliberately falsified component tagging records."[89] The NRC wrote that its investigators had "reviewed logs of badging

---

[85] Bischof Decl. ¶ 16; Jenkins Decl. ¶ 22.

[86] Dkt. 33-3 (NRC Letter to Madison dated June 30, 2017).

[87] Dkt. 33-3 at 99 (NRC Letter to Madison dated August 30, 2017).

[88] Dkt. 33-3 at 100 (NRC Letter to Madison dated August 30, 2017, enclosure).

[89] Dkt. 33-3 at 101 (NRC Letter to Madison dated May 21, 2019); *id.* at 103 (enclosure).

records for specific areas in the plant, conducted interviews with maintenance supervisors, staff and managers, and reviewed applicable procedures and condition reports."[90] The NRC found that, "[b]ased on your own admission, and the results of the [NRC's] investigation, the NRC determined you were the individual which deliberately falsified records, and your actions caused the licensee to be in violation of NRC requirements."[91]

The NRC concluded its letter to Madison, stating: "the allegation that other maintenance supervisors (besides you) at North Anna are not walking down tag outs to ensure safety prior to commencing work was not substantiated, however, it was determined that one electrical maintenance supervisor (you) were not walking down tag outs prior to commencing work, as required by licensee procedure OP-AA-200, Equipment Clearance."[92]

4.  Procedural History

In May 2017, Madison filed a complaint with the Department of Labor. Dkt. 1 at 8 (¶ 41). After Madison's case had been pending for one year with the Department of Labor, in May 2018, Madison filed brought this federal suit against Dominion under the Energy Reorganization Act, instead. Dkt. 1. In August 2019, Dominion filed its pending motion for summary judgment, which has been fully briefed and argued. Dkts. 32, 35, 41, 42.

**Standard of Review**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury

---

[90] Dkt. 33-3 at 103 (NRC Letter to Madison dated May 21, 2019, enclosure).

[91] Dkt. 33-3 at 103 (NRC Letter to Madison dated May 21, 2019, enclosure).

[92] Dkt. 33-3 at 103 (NRC Letter to Madison dated May 21, 2019, enclosure).

to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

In making that determination, the Court must take "the evidence and all reasonable inferences

drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d

524, 531 (4th Cir. 2011) (en banc).

The moving party bears the burden of proving that judgment on the pleadings is

appropriate. *Celotex Corp. v. Catretti*, 477 U.S. 317, 322–23 (1986). If the moving party meets

this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a

genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present

sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for

the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert City*, 48 F.3d

810, 818 (4th Cir. 1995).

The Court conducts a de novo review of Madison's allegations stemming from his

complaint under the ERA. 42 U.S.C. § 5851(b)(4).

### Applicable Law

An employee raising a claim under § 211 of the ERA must first establish a prima facie case

showing that:

(i)    The employee engaged in a protected activity

(ii)   The employer knew … that the employee engaged in the protected activity;

(iii)  The employee suffered an adverse action; and

(iv)   The circumstances were sufficient to raise the inference that the protected
       activity was a contributing factor in the adverse action.

*Smith*, 674 F. App'x at 314 (citing 29 C.F.R. § 24.104(f)(2)). However, if the employee establishes

such a prima facie case, "the burden shifts to the employer respondent to establish by clear and

convincing evidence that the employer 'would have taken the same unfavorable personnel action in the absence of [the complainant's protected] behavior.'" *Id.* at 314–15 (citing 42 U.S.C. § 5851(b)(3)(D)).[93]

### Analysis

The Court concludes that Dominion is entitled to summary judgment because Madison has not shown a *prima facie* claim under § 211 of the ERA, specifically, in that he has not raised a genuine dispute of material fact that his alleged protected activity "was a contributing factor" in Dominion's decision to fire him.[94] Under the ERA, "an employer may discharge an employee who has engaged in protected conduct so long as the employer's decision to discharge the employee is not motivated by retaliatory animus and the employer has reasonable grounds for the discharge." *Lockert v. Dep't of Labor*, 867 F.2d 513, 519 (9th Cir. 1989); *see also Smith*, 674 F. App'x at 316 ("protected activity will not shield an under-performing worker from discipline"); *cf. Am. Nuclear Res.*, 134 F.3d at 1296 ("An employer may terminate an employee who behaves inappropriately, even if that behavior relates to a legitimate safety concern.").

Madison argues that Dominion did not fire him for using the gym during the workday, or for delegating walk-down safety checks to subordinates, but rather, "because he made numerous

---

[93] While *Smith* involved an appeal from a final decision of the Department of Labor that dismissed a whistleblower complaint under the ERA, courts have also applied this framework to claims arising under § 211 of the ERA that are addressed by a federal court in the first instance. *E.g.*, *Sanders*, 812 F.3d at 1197. And here, there is no dispute that this is the applicable framework governing Madison's claims. Dkt. 33 at 13–14, Dkt. 35 at 9 (contending that "Dominion's own evidence demonstrates that Madison has made a *prima facie* showing of all of the elements required to prove a claim under § 211").

[94] Because the Court concludes that Madison has not made a *prima facie* case on the fourth element of the claim (*i.e.*, whether the "circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action"), the Court need not address Dominion's arguments that Madison's "deliberate regulatory violations preclude relief," Dkt. 33 at 14–16, or that Madison did not engage in "protected activity" under the ERA, *id.* at 16–19.

reports of widespread regulatory violations, and Dominion was attempting to discredit his repeated reports that the delegation of walkdowns was widespread at North Anna." Dkt. 35 at 1. Simply put, the record in no way bears out Madison's theory that any such "reports" were in any way a "contributing factor" in his termination.

Madison argues that he first reported "widespread violations" of Dominion policy OP-AA-200 on November 21, 2016. Dkt. 35 at 1–2. Yet days before that, the Site Vice President at North Anna—who ultimately made the decision to fire Madison—had already written to the North Anna Plant Manager in an excoriating email that Madison "*deserves termination due to falsifying walkdown of tagouts*."[95] And before that, Madison's superiors had already been well-underway investigating reports of Madison's tardiness, absenteeism, and failure to supervise his employees, including:

- <u>Mid-2016</u>. Then-Manager of Nuclear Maintenance at North Anna began to look into complaints that Madison was "arriving late to his shifts and was not often in the field throughout the plant supervising his crew."[96]

- <u>October 2016</u>. Within days of Madison's supervisor's (Meadows) arrival, he saw Madison coming into the office late, and heard concerns from the Electrical Maintenance team that Madison was "spending a 'good portion' of his time at the gym, rather than supervising his crew."

- <u>October 15, 2016</u>. Meadows was "*surprised and alarmed*" following his initial investigation into Madison's timekeeping and entries into the "protected area" of North Anna. Meadows learned Madison was not in the protected area at all for ten days during a recent outage; on eight other days, he was in the protected area for less than an hour. Meadows could not see how Madison "was possibly supervising his crew if he was not spending any time on his shifts (or almost no time) in the protected area."[97]

---

[95] Bischof Decl. ¶¶ 6–7; Dkt. 33-24 at 2.

[96] Jenkins Decl. ¶ 8.

[97] Meadows Decl. ¶ 7.

- <u>November 1, 2016</u>. Meadows reported his findings to the then-Manager of Nuclear Maintenance at North Anna, who directed Meadows to investigate further.

- <u>November 1-14, 2016</u>. Meadows's further investigation revealed that during the most recent outage there were at least eight times when Madison attested in Dominion's tagging database, "I have verified the tagging boundary and find it acceptable for the scope of work," and "I have walked down the area and consider it safe to work," despite his badge records confirming that he did not personally conduct the walk-down safety check.[98]

- <u>November 15, 2016</u>.[99] Fact-finding meeting with Madison:

  o Madison initially told Jenkins and Meadows he always personally conducted the walk-down safety check, but when he was confronted with evidence to the contrary, he changed his story.

  o Meadows admitted that he was going to the gym between an hour and an hour and a half each morning, during which periods his time records had inaccurately showed he was at work. He offered to come in 30 minutes early "for the rest of his career to make up for it."

After that, on November 17, 2016, Jenkins briefed Vice President Bischof about the substance of Meadows's investigations and Bischof wrote that evening: Madison "*deserves termination due to falsifying walkdown of tagouts*."[100] Bischof ultimately decided that further investigation and fact-finding was warranted, and he asked Corporate Security at Dominion to open an investigation. All of that happened before, even in Madison's telling, he first reported there were "widespread" violations of Dominion's policy for supervisors to personally conduct walk-down safety checks. *See* Dkt. 35 at 1-2. Thus, the "undisputed timing of events leading up to [Madison's] discharge," Dkt. 33 at 22, undermine any argument by Madison of a causal connection between his alleged

---

[98] Meadows Decl. ¶ 14; Dkt. 33-13 at 2 (tagging database sign-in scree); Dkt. 33-8 (summary of "problematic tagout clearances").

[99] Jenkins Decl. ¶¶ 14–15; Meadows Decl. ¶¶ 27, 28; Dkt. 33-14 at 4–5.

[100] Bischof Decl. ¶¶ 6–7; Dkt. 33-24 at 2.

protected activity and his firing. *See, e.g.*, *Walton-Horton v. Hyundai of Alabama*, 402 F. App'x 405, 409 (11th Cir. 2010) (holding there is no *prima facie* case for Title VII relation given the lack of a "causal connection between her complaints and her discharge"; "Smith, who recommended Walton-Horton be discharged, had no knowledge of Walton-Horton's pre-investigation complaints, and Walton-Horton only complained to Smith after Smith had already begun investigating her behavior").

Thereafter, following Dominion's Corporate Security investigation and findings, Bischof attested he believed either of the following violations would have warranted terminating Madison: (1) Madison was improperly recording his work hours, including by going to the gym regularly for an hour to an hour and a half each day, which he did not make up at other points during the day (and, in fact, regularly recorded that he had worked overtime); and (2) he was improperly certifying that he personally conducted walk-down safety checks when records demonstrated he had not.[101] Nor did Bischof's opinion did not stand alone. For example, Madison's immediate supervisor was "surprised and alarmed" by the minimal extent of Madison's supervision over his own subordinates.[102]

Madison has not shown any genuine dispute of material fact to support his claim that his "reporting" other supervisors engaged in similar behavior delegating walk-down safety checks contributed to his termination. *See Smith*, 674 F. App'x at 316 (stating that "protected activity will not shield an under-performing worker from discipline"). Indeed, Madison spends little if any effort challenging the documented investigations into his under-performance going back to early October 2016—well before his first alleged "reporting" of violations of OP-AA-200. *See, e.g.*,

---

[101] Bischof Decl. ¶¶ 13–15.

[102] Meadows Decl. ¶ 7.

Dkt. 35 at 2–4. Madison does argue that "the decision to terminate [him] was based in large part on the claim that his reporting of violations by other supervisors 'was not substantiated,'" quoting a December 7, 2016 email from Bischof. Dkt. 35 at 4. The full text of the email (and not just the quotation Madison selected) shows the opposite: the decision had been long been made and that it was consistent well before Madison reported other supervisors were doing the same thing.[103] And indeed, there is no dispute Bischof's earlier determination on November 17 that Madison "deserved termination" for "falsifying walkdown of tagouts," was made at a time when he "had no idea" Madison would allege other supervisors engaged in the same behavior.[104] This cannot supply the causal connection Madison lacks. *See, e.g.*, *Walton-Horton*, 402 F. App'x at 409 ("Smith, who recommended Walton-Because Smith was unaware of the protected activity at the time she recommended Walton–Horton's termination, the fact that she later learned of Walton–Horton's complaints does not establish a causal connection.").

Madison suggests that violating the tagging procedure was pretext, because "Dominion had never before fired an employee for violation of OP-AA-200." Dkt. 35 at 4. But that also is not substantiated. The record reflects that Dominion's Corporate Security officers took very seriously Madison's allegation that others engaged in similar conduct and promptly acted on it, conducting interviews of several other supervisors to determine whether there was any broader issue with delegating walk-down safety checks. They determined that there was no such issue—Madison was the only one regularly and deliberately falsifying his records on these walk-down safety checks.

---

[103] Dkt. 35-2 at 22 ("Madison's attempt to throw others under the bus *after he realized he was going to be terminated* was not substantiated by corporate security and corporate recommends moving forward with termination at this point," and that "reviews and recommendation were inclusive and *did not differ from recommendation I sent you a couple weeks ago*") (emphases added).

[104] Bischof Decl. ¶ 6. And indeed, Plaintiff does not even argue he raised the allegation about other supervisors until several days later, on November 21, 2016. Dkt. 35 at 2.

Indeed, the NRC investigated the matter, and it came to the same conclusion. It wrote to Madison that "the allegation that other maintenance supervisors (besides you) at North Anna are not walking down tag outs to ensure safety prior to commencing work was not substantiated," but "one electrical maintenance supervisor (you) were not walking down tag outs prior to commencing work, as required by licensee procedure OP-AA-200, Equipment Clearance."[105] Against this mountain of evidence, Madison cites an ambiguous statement by one other supervisor (Holloway) who suggested it may have happened but he could not name any incident or other supervisor who had done so.[106] Madison also points to a bare-bones declaration, which he introduced, of a now-retired electrician at Dominion who attested that at some undefined time, he had "witnessed supervisors, other than [Madison], requesting electricians to walk down tags on supervisors' behalf and/or to perform work without the supervisor's prior verification of tags."[107]

This is no more than a "mere scintilla" of evidence, which cannot withstand a summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Nothing in Holloway's interview notes or the declaration Madison introduced clearly shows anyone else has done what the record demonstrates Madison *consistently* did—namely, certifying on Dominion's tagging database that "I have verified the tagging boundary and find it acceptable for the scope of work," and "*I have walked down the area and consider it safe to work*,"[108] when the supervisor had not personally done those things. While the Court concludes that there is no genuine issue of material fact that Dominion's OP-AA-200 policy required supervisors to personally conduct walk-

---

[105] Dkt. 33-3 at 103 (NRC Letter to Madison dated May 21, 2019, enclosure).

[106] Dkt. 33-20 (Holloway interview) at 3–4.

[107] Dkt. 35-4 at 2.

[108] Jenkins Decl. ¶ 5 (emphasis added); Dkt. 33-13 at 2 (emphasis added).

down safety checks,[109] it would be a separate question whether the policy requires it, from whether a supervisor is falsely certifying "*I have walked down the area and consider it safe to work*," as Madison was doing regularly.

At bottom, there is no a genuine issue of material fact about whether only a supervisor can perform the walk-down safety check, and even if there were, it does not impact the analysis here. There were two well-documented reasons for Madison's termination, and Madison points to no evidence that his *reporting* that other supervisors engaged in similar conduct delegating walk-down safety checks, contributed to his firing. Accordingly, the Court concludes that Madison has not demonstrated a *prima facie* case under § 211 of the ERA.

In any event, even if the Court had concluded that Madison had demonstrated a *prima facie* case under § 211 of the ERA, the Court would conclude that Dominion has established by clear and convincing evidence it "would have taken the same unfavorable personnel action in the absence of [the complainant's] protected behavior." *Smith*, 674 F. App'x at 314. Notably, from at least October 1, 2016 until Madison's firing in December 2016, Madison's supervisors and Corporate Security investigated Madison numerous times and substantiated his falsification of his time records, including by going to the gym for substantial time each work day, and logging overtime when he had not actually worked the requisite hours; as well as falsely certifying that he

---

[109] Indeed, the primary evidence to the contrary appears to come from Madison himself, who has also admitted that the policy *does* require supervisors to personally perform walk-down safety checks. *Compare, e.g.* Madison Dep. 55:2–7; Jenkins Decl. ¶ 16 (Madison "admitted that he was wrong and that he violated Dominion procedure"); with Madison Dep. 116:18–23. Madison has admitted as much. Dkt. 35 at 2 (arguing that it is Dominion's fault "the only evidence is Madison's own testimony" previous supervisors also delegated walk-down safety checks). In any event, a party cannot create a genuine issue of material fact by contradicting himself. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

was personally conducting walk-down safety checks on Dominion's tagging database. Madison's supervisors and colleagues raised consistent concerns and even alarm at such practices. The NRC also conducted an investigation into whether there were any instances of supervisors improperly delegating walk-down safety checks, and concluded that Madison was the one Dominion employee doing so. *See, e.g.*, *Lockert*, 867 F.2d at 519 (employee engaging in protected conduct can be discharged so long as employer "not motivated by retaliatory animus and the employer has reasonable grounds for the discharge").

### Conclusion

For the foregoing reasons, the Court will grant Dominion's motion for summary judgment, Dkt. 32, and award Dominion summary judgment.

The Clerk of Court is directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this ___1st___ day of June, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE